**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-CR-30159-MJR** |
| | ) | |
| **JOHN   WYSINGER,   a/k/a   Cool,   a/k/a Unc,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**REAGAN, District Judge:**

A grand jury indicted John Wysinger and five co-defendants on October 21, 2009. A superseding indictment against the six appeared on December 16, 2009, but the allegations as to Wysinger remained the same: he allegedly violated 21 U.S.C. §§ 846 by being part of a conspiracy to distribute crack cocaine between May 2006 and June 2009 and allegedly violated 21 U.S.C. § 841(a) and 18 U.S.C. § 2 by aiding and abetting the distribution of cocaine around May 27, 2009. (Superseding Indictment 1–2.) After the Court continued the trial of the case, Wysinger filed an abundance of pretrial motions. (Docs. 101–108.) The United States opposes all of them. (Doc. 112.) All of them will be denied.

**Sufficiency of the Indictment & Bill of Particulars**

Wysinger has moved to dismiss the indictment against him, and presents two main arguments for dismissal. (Doc. 108.) The first of the two arguments is that the indictment is insufficient. He has also moved for a bill of particulars. (Doc. 102.) Because the question of whether an indictment is sufficient and whether a bill of particulars should be filed have a similar analytical framework, the Court will consider these questions together.

Wysinger's argument for insufficiency is made in four parts: (1) the indictment does not state sufficient facts to charge Wysinger with an offense; (2) that the indictment does not comply with Rule 7(c); (3) the indictment does not apprise Wysinger of the charges against him with sufficient particularity or specificity and (4) that the indictment is repugnant to the Fifth and Sixth Amendments to the Constitution because it fails reason #3 and, for that reason, does not protect Wysinger against double jeopardy. Each one of these objections is overcome, however, if the indictment serves its three main functions: "It must state the elements of the crime charged, adequately inform the defendant of the nature of the charges, and allow the defendant to plead the judgment as a bar to future prosecutions." *United States v. Singleton*, 588 F.3d 497, 499–500 (7th Cir. 2009) (citations omitted) (citing Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, 191 F.3d 799, 805 (7th Cir. 1999)); *accord United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).

Count 1 of the indictment charges conspiracy under 21 U.S.C. §§ 841(a) and 846, and the Seventh Circuit "has consistently held" that an indictment charging a drug conspiracy "fulfills these functions if it sets forth the existence of a drug conspiracy, the operative time of the conspiracy, and the statute violated." *Singleton*, 588 F.3d 497, 499–500 (7th Cir. 2009) (citations omitted) (citing *United States v. Cox*, 536 F.3d 723, 727–28 (7th Cir. 2008); *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991)). Count 1 contains all the elements that are sufficient for a conspiracy charge: it sets forth the existence of the drug conspiracy, alleges that the conspiracy occurred between May 2006 and June 2009 and indicates that 21 U.S.C. §§ 846 and 841(a) are the statutes violated. (Superseding Indictment 1–2.)

Count 2 does not charge conspiracy but charges actual distribution in violation of 21 U.S.C. § 841(a). An indictment that tracks the statutory language is generally sufficient, especially if it provides a method of "pinning down the specific conduct at issue." *See Smith*, 230 F.3d at 305 (citing *Russell v. United States*, 369 U.S. 749, 763 (1962); *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.

1981); *United States v. Josten*, 704 F. Supp. 841, 844 (N.D. Ill. 1989)). The superseding indictment in Count 2 alleges that Wysinger knowingly and intentionally possessed with intent to distribute at least 500 grams of a controlled substance, which tracks the language of 21 U.S.C. § 841(a). It also alleges that the distribution occurred around May 27, 2009 in St. Clair County, Illinois, giving Wysinger a method of pinning down the specific conduct at issue. The superseding indictment goes even farther than required as it charges Wysinger specifically with aiding and abetting the possession, which "is merely a theory of liability, not a substantive offense, and need not be charged in the indictment." *United States v. Schuh*, 289 F.3d 968, 976 (7th Cir. 2002) (citing *United States v. Ruiz*, 932 F.2d 1174, 1180 (7th Cir. 1991)). Count 2, then, is sufficient.

Also related to the indictment issues is Wysinger's motion for a bill of particulars. (Doc. 102.) Wysinger argues that, on the indictment alone, he will be unable to adequately prepare his defense and asks the Court to order the United States to prepare a bill of particulars. The reasons he offers for this conclusion are (1) he is unaware of the nature of the crimes with which he is charged; (2) the indictment does not list the acts that would qualify as aiding or abetting; (3) the indictment does not list the amount of cocaine that was involved in the conspiracy and (4) the indictment does not list the addresses within the Eastern District of Missouri where the conspiracy took place.[1]

The Court can order the United States to prepare a bill of particulars. Fed. R. Crim. P. 7(f). To determine whether it should order the bill, the Court undertakes an analysis similar to constitutional sufficiency of the indictment: "[I]n both cases, the key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial

---

[1] It is odd that Wysinger would object to the lack of addresses in Missouri when the indictment charges him mainly with a conspiracy in Saint Clair County, Illinois and does not mention Missouri specifically. Perhaps this is a cut-and-paste error missed at the proofreading stage.

3

preparation." *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) (citing *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003)). Important information for preparing a defense would be "the elements of each charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the statute or statutes violated." *Id.* (citing *Fassnacht*, 332 F.3d at 446). Even if the indictment fails to provide "the full panoply" of the information, the Court need not order a bill of particulars if the information is available from discovery or another satisfactory form. *Id.* (quoting *Hernandez*, 330 F.3d at 975).

Wysinger's situation is awfully similar to the defendant in *Blanchard*. The indictment here, although constitutionally adequate, is admittedly sparse. However, Wysinger has plenty of access to discovery, being given at this point 459 pages of discovery and 36 compact discs of recordings relating to the offense with which he is being charged. As he has access to the full panoply of information required to prepare a defense, a bill of particulars is unnecessary.

### Grand Jury Issues

Wysinger's second argument for dismissal of the indictment involves the grand juries. He argues that the indictment was made on insufficient evidence or hearsay evidence before the grand jury that indicted him. His argument that the indictment was made on insufficient evidence will fail. As the Supreme Court has stated, defendants cannot challenge an indictment on these grounds:

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

*Costello v. United States*, 350 U.S. 359, 363 (1956) (footnote omitted).

Related to this reason for dismissal is Wysinger's motion to disclose grand jury proceedings. (Doc. 106.) Wysinger seeks disclosure of the grand jury's minutes and records, as well as any prior presentments to the grand jury or records of other grand juries that had considered the instant presentment. The purpose of this sweeping request, according to Wysinger, is "not to invade the secrecy of the grand jury, but to determine what procedures were followed by the Government in presenting this matter and obtaining the instant indictment." Specifically, Wysinger wants to determine if the evidence before the grand jury was gathered by other grand juries, if the grand jury was given the opportunity to review and vote on each count of the indictment, and whether counsel for the United States properly advised the grand jury on matters of law.

Although the proper functioning of grand juries "depends upon their absolute secrecy," *In re Grand Jury Proceedings, Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991), the Court may order the disclosure of grand jury proceedings to a defendant "who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The key phrase of the rule is "show that a ground may exist" as opposed to "speculate that a ground may exist." In other words, "[i]n order for a party to gain access to the normally inaccessible transcripts of proceedings before a grand jury, there must be a showing of particularized need." *United States v. Canino*, 949 F.2d 928, 943 (7th Cir. 1991) (citing *United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir. 1978)). The burden of demonstrating "particularized need" is met if the defendant shows that the grand jury records are "needed to avoid possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [the] request is structured to cover only material so needed." *United States v. Balogun*, 971 F. Supp. 1215, 1232 (N.D. Ill. 1997) (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979)). Additionally, "in considering the effects of disclosure of grand jury proceedings, the courts must consider not only immediate effects upon a particular grand jury, but also the possible

effect upon the functioning of future grand juries." *Id.* (quoting *Douglas Oil*, 441 U.S. at 222). However, it should be noted that "[m]ere unsupported speculation of possible prosecutorial abuse does not meet the particularized need standard." *Canino*, 949 F.2d at 943 (citing *Edelson*, 581 F.2d at 1291).

There are two problems with Wysinger's request that compel its denial. First, every one of his concerns is speculation. Although Wysinger goes at length in his brief to discuss the important role that the grand jury has in the legal system and the important ethical rules that prosecutors must maintain in those proceedings, he alleges no facts which would suggest that those rules have been breached or that those roles have been usurped. He merely presents a suspicious hunch that a breach or usurpation has taken place and wants the records to see if it did. *See Canino*, 949 F.2d at 943 ("[T]he defense, in its brief, has not pointed to anything in the record which might suggest that the prosecutor engaged in improper conduct before the grand jury. We are left with only the defense's suspicious hunch . . . ."). A mere hunch is not good enough for the Court to break the secrecy required for the effective functioning of the grand jury. The second problem with the request is that, even if Wysinger had provided something that provided a reason to break the grand jury's secrecy, his request is not at all structured to cover only necessary material. In requesting *all* the records from the indicting grand jury relating to himself and potentially other past ones, his request is immense, so much so that routinely allowing those sorts requests would "replace the general rule of secrecy of grand jury proceedings with a general rule of open discovery of grand jury proceedings." *Balogun*, 971 F. Supp. at 1232. The Court declines to do so.

**Motion for Pretrial Hearing on Admissibility of Co-Conspirator Statements**

Wysinger has also moved for the Court to determine, before trial, the admissibility of co-conspirator statements offered against him that would otherwise be hearsay. (Doc. 103.) The burden of admissibility of the otherwise hearsay statements is on the United States, which must show by

preponderance of the evidence that "(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement(s) sought to be admitted were made during and in furtherance of the conspiracy." *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009) (citing *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991); *United States v. Santiago*, 582 F.2d 1128, 1133–34 (7th Cir. 1978)). The United States may, but need not, follow a procedure known as a *Santiago* proffer, in which it may "submit evidence of these elements in a pre-trial proffer, and the district court may admit the statement(s) subject to its later determination during trial that the government has established by a preponderance of the evidence the three foundational elements." *Id.* (citing *Santiago*, 582 F.2d at 1131).

Wysinger does not indicate on which co-conspirator statements he wants the Court to make a pre-trial admissibility determination, and although the United States indicates that co-conspirator statements are possible, it notes that it is not in a position to seek a pretrial ruling on admissibility. This matter is not ripe for holding a hearing yet, and even if it were the Court is not required to hold a hearing as the admissibility of the statements could be determined at trial. *Id.* As the trial date approaches, the parties should become more aware of the potential co-conspirator statements, at which time the Court can revisit holding a hearing outside the jury's presence regarding admissibility.

### Motions for Discovery

Wysinger also asks the Court for three discovery orders. The first is a request for a broad disclosure of evidence favorable to Wysinger or impeaching of the government's witnesses, such as a witness's prior felony convictions, prior criminal conduct not resulting in a conviction, and prior occasions in which the witness has testified before a court or grand jury. (Doc. 104.) The second request is for any promises of leniency toward government witnesses with respect to charges against them, decisions not to prosecute, decisions to diminish taxes due or other benefits. (Doc. 107.) The two requests can be placed under the heading of seeking impeachment evidence to be used in trial.

The prosecution's duty under the Due Process Clause to disclose evidence favorable to the defense includes not just exculpatory evidence but impeachment evidence as well. *United States v. Mitchell*, 178 F.3d 904, 907 (7th Cir. 1999) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Boyd*, 55 F.3d 239, 244 (7th Cir. 1995)).

Although Wysinger represents that the United States has refused to disclose the above evidence, the United States represents that it presently has no such witnesses to which that information applies, that it has turned over all evidence that it is required to disclose so far and that, once it determines its witnesses (which should be soon as all co-defendants have pleaded guilty or are scheduled to do so), it will seasonably comply with its constitutional and statutory discovery duties when required. When faced with a broad, non-specific request for disclosure, other district courts have, on this representation, decided not to compel disclosure and have been affirmed by the Seventh Circuit. *See, e.g.*, *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) (affirming a district court that relied on the "bonafides of the government" when the defendant failed to allege "specific pieces of evidence that had been withheld"); *see also id.* ("[W]e hasten to point out that *Brady* does not grant criminal defendants unfettered access to government files." (alteration in original) (quoting *United States v. Phillips*, 854 F.2d 273, 278 (7th Cir. 1988))). The Court will follow the same course. If this ends up being an incorrect assumption and Wysinger is subjected to discovery surprise during trial, the Court retains the power to impose discovery sanctions, including continuation of the case, exclusion of the evidence that should have been disclosed, or other just remedies. *See* Fed. R. Crim. P. 16(d)(2) (noting that, if a party does not comply with Rule 16, the Court may continue the case, prohibit introducing the evidence that should have been disclosed, or enter an order "that is just under the circumstances"); *United States v. Cruz-Velasco*, 224 F.3d 654, 665 (7th Cir. 2000) (noting that the district court sanctioned the government's failure to produce a document before trial by

forbidding the government from using the document, and that this remedy was within the court's discretion).

Wysinger also asks the Court to order the United States to preserve and produce the rough notes taken by government agents of interviews with persons who may be witnesses at trial. The Court declines the invitation to order the discovery of these notes but sees no reason why they ought not be preserved. *See* Fed. R. Crim. P 16(a)(2) (noting that reports or memoranda made by government agents in connection with investigating or prosecuting the case are not discoverable); *United States v. Morris*, 957 F.2d 1391, 1402 (7th Cir. 1992) ("'A government agent's summary of a witness's oral statement that is not signed or adopted by the witness is not producible.'" (quoting *United States v. Allen*, 798 F.2d 985, 994 (7th Cir. 1986))); *United States v. Morrison*, 946 F.2d 484, 494– 95 (7th Cir. 1991) ("Agent notes and summaries of witness statements that are neither adopted by the witness nor substantial verbatim recitals of what the witness said are deemed unreliable under the [Jenks Act] and need not be produced."); *United States v. Harris*, 542 F.2d 1283, 1292 (7th Cir. 1976) ("[N]othing in the Jencks Act requires that notes made in the course of an investigation be preserved after they have served their purpose in the preparation of interview reports.").

**Motion to Suppress Evidence**

Finally, Wysinger asks the Court to suppress evidence obtained as the result of an interrogation made while Wysinger was under arrest. (Doc. 101.) Wysinger argues that he was not properly informed of his rights as required by *Miranda v. Arizona* before the government's agents interrogated him while in custody. 384 U.S. 436 (1966). He also argues that even if he was properly read his rights, he invoked his right to consult an attorney or have an attorney present for questioning, yet the government agents continued to question him. He seeks to suppress the statements made to the agents as well as the video made of the interrogation.

Based on the parties' submissions, the Court concluded that the question on suppression could be decided without a hearing and ordered the United States to produce to the Court the video in question (which had already been disclosed to Wysinger). The video can be summarized as follows:

Facts

Wysinger was interrogated on June 9, 2009 in an interview room in an East Saint Louis Police Department building. A video of that interrogation was made. The video began at 12:53 PM and shows Wysinger seated alone at a table secured with hand restraints. Soon, two agents of the Drug Enforcement Agency entered the room; one was named Mike Rehg, who did most of the talking.

Agent Rehg began to speak to Wysinger, but then Wysinger interrupted him, saying, "Do I need a lawyer before we start talking?"

Rehg's answer was, "Well, we are going to talk about that. Here we go." He then introduced himself and the other agent (whose name was inaudible on the video) and told Wysinger that they worked for the DEA. Rehg then said, "Make no bones about it, you are under arrest. Make no bones about it." Wysinger asked a clarifying question about his arrest, which Rehg answered. Rehg then told Wysinger that he had the right to remain silent, that anything he said could be used against him in court, that he had a right to talk to a layer for advice before questioning or to have an attorney present during questioning, and that an attorney would be provided if he could not afford one.

After reciting this information, Rehg and Wysinger had this conversation:

Rehg:      Have you been arrested before?

Wysinger: Yeah. [inaudible]

Rehg:      By yourself. Do you understand your rights, though?

Wysinger: Yeah.

Rehg:      You've got a high school education? College education? I
           don't know.

Wysinger: None of that.

Rehg:      But you understand, right?

Wysinger: Yeah.

Rehg:      Uh. You know, listen. I'm, uh, we're going to cut to the
           chase. We're going to lay it out for you a little bit.

Wysinger: All right.

Rehg:      And it's going to be up to you what you want to do.

The agents then began to make statements to Wysinger about the case, and Wysinger began to

volunteer information. Rehg interrupted him: "If you want to say anything, you don't have to. I'm

going to tell you what the story is, so you're going to need to listen for a minute." Rehg then again

began making statements, with Wysinger volunteering information as the time went by with Rehg

asking questions about the information volunteered. At about 1:03 PM, Rehg and Wysinger had this

colloquy:

Rehg:      Well tell us what has been going on. Maybe that's the best
           way to start.

Wysinger: I mean, you think I should have a lawyer?

Rehg:      That's up to you, and we don't use these sheets—these are
           East Saint Louis[2]—but I've read you your rights.

Wysinger: Mm hmm.

Rehg:      If you want an attorney, by all means get one, okay?

Wysinger: Okay, but can I call one now? That's what I'm saying.

_____

[2] When Rehg said "sheets," he gestured to a few sheets in front of Wysinger. It seems that the sheets in front of
Wysinger were standard forms in use by the East Saint Louis Police Department for reading *Miranda* rights to suspects in
custody.

Rehg:          Well, who do you want to call?

Wysinger could not remember the name of the attorney that he wanted to contact, but he told the agents that the attorney's name and telephone number was on a sheet of paper in his van. Wysinger indicated that the attorney was local, so Rehg asked Wysinger the name of the attorney so he could call him. Wysinger could not remember. Rehg asked permission to get the sheet of paper out of the van, which Wysinger gave. This conversation then commenced:

Rehg:          Is there any dope or money in the van?

Wysinger:   No, there ain't shit in the van.

Rehg:          We can go take a look?

Wysinger:   Look, we came down here to get a lawyer for my brother, and try to get the vehicle—you know what I'm saying?—that was in Julius' name. You know what I'm saying? Because it was a rental vehicle. Julius had rented the vehicle, you know what I'm saying?

Rehg:          We realize that, right.

Wysinger:   So we're trying to get the rental vehicle before they keep running up his credit card because his credit card is old, you know what I'm saying? So I told him that I'd go down with him, we'd try to get this van back—you know what I'm saying?—and take the van back 'cuz they're going to keep charging your card for it.

Agent 2:     Did you have a chance to talk to an attorney yet? Or were you talking to him on the phone? Or—

Wysinger:   Yeah, I was talking to him about my brother. That's where we was going. I was going to get this son of a bitch to bring me to the police station to show me where the van was 'cuz we don't know how to get around here, you know what I'm saying. So I was going to ask him to take me to the East Saint Louis police station—

Rehg:          Well, listen. Let me just tell you this. We intercepted calls, the reason we knew where you were at to begin with—

Wysinger:   Mmm hmm.

Rehg:          —and that's not what the conversation was.

12

Wysinger: Naw, he was talking about some other bull shit, you know what I'm saying? They kicked in my door and all this other shit, you know what I'm saying? I said what was this five minutes ago?

Rehg:     No, last night.

Wysinger: But I'm telling him. What was this five minutes ago? I just talked to you. Why are you calling me and telling me shit like that?

Rehg:     Well, listen to me. That's—and that's why we were here. That's how we knew where to find you. We heard the phone call. . . . And that's why, you know, of course, I'm familiar with Rajdell, I'm familiar with Julius, and I'm familiar with the girl, but—

Wysinger: I ain't familiar with Julius.

Rehg:     Well, just like you said, he's rented the van, he rented the van last time, and he's down here with you now, so—

Wysinger: Oh.

Rehg:     We'll go out in the van and get that number if you want an attorney. If you don't, we'll get this thing going so you'll know where you're at. It's up to you.

Wysinger: I just don't want to cross no lines and—you know what I'm saying?—regret shit. I mean, 'cuz I wanna work with you, you know what I'm saying?

Before leaving to get the number, the agents began asking more questions regarding the attorney, specifically what the attorney's phone number was, was the attorney his brother's as well, and whether Wysinger paid a retainer yet. Wysinger indicated the possible last four digits of the phone number, indicated that it was not his brother's attorney because his brother did not have an attorney yet, and that he had not paid any retainer yet for him or his brother. Rehg then had a question for him:

Rehg:     Is that what the cash is for?

Wysinger: Yeah

Rehg:     Why do they have it?

Wysinger: Why do they got it on them? [inaudible] It was in the car.

Rehg:     They just put it in their pockets when we pulled them over, probably.

The agents then left the interview room at around 1:07 PM. The agents reentered the room at 1:12 PM with an envelope, which they handed to Wysinger. After Wysinger indicated which number on the paper was the attorney's number, Rehg asked if he could call the attorney. Wysinger consented, and Rehg proceeded to dial on his cell phone a number and began a conversation with a person on the other line. After explaining the situation to the person, Rehg handed the phone to Wysinger, who then began to talk with the individual. Wysinger ended the conversation at 1:17 PM, and Rehg took the phone back, spoke a little more with the attorney, and then hung up the cell phone.

Rehg then began to explain what was next going to happen. Rehg said he would look into getting the money released so that Wysinger could pay the attorney. These questions followed:

Rehg:     About how much were you taking him?

Wysinger: $5000.

Rehg:     And that's the money those guys must've had in their pockets?

Wysinger: Mmm hmm.

Rehg revealed that the attorney could not come by until Friday, so they would be seeing if Wysinger could be released and then come back on Friday. The agents cautioned Wysinger not to talk to anyone except the attorney while he was being released. During that cautionary discussion, these questions were asked:

Rehg:     You don't have a drug prior?

Wysinger: Hell no. [inaudible] I don't have no prior nothin'. Under either name.

> Agent 2:   The DEA had a case on you in '07. Were you arrested for
> it? Did anybody pick you up?
>
> Wysinger: [Inaudible]
>
> Rehg:      Money laundering charge?
>
> Wysinger: Not that one. I ain't never had no charge, period.

After further cautioning Wysinger, the agents left the interview room around 1:26 PM, which is

when the video cut off.

Analysis

The parties do not dispute that Wysinger was in custody at the time of his interrogation.

What they do dispute is Wysinger's freedom in making statements to the agents, the sufficiency of

the warnings given to Wysinger before the interrogation and whether Wysinger invoked his right to

consult an attorney.

The first argument of Wysinger's that the Court will address is his argument that, as an

individual of limited education, Wysinger was induced to offer the information by promises of the

agents conditioned on Wysinger's cooperation. The only promise that the agents made, though, was

that they would bring Wysinger's cooperation to the attention of the United States Attorney in the

hopes that Wysinger's brother or Wysinger himself would be given leniency. Those sorts of

promises do not make a defendant's cooperation involuntary. *See United States v. Charles*, 476 F.3d

492, 497 (7th Cir. 2007) ("[P]romises . . . to bring cooperation by the defendant to the attention of

prosecutors do not render a confession involuntary." (citing *United States v. Dillon*, 150 F.3d 754, 758

(7th Cir. 1998); *United States v. Westbrook*, 125 F.3d 996, 1005–06 (7th Cir. 1997)); *id.* at 498 ("Under

the case law, promises to seek favorable consideration from the prosecutor do not undermine the

voluntariness of a confession.").

Wysinger's next arguments all address his *Miranda* rights. He first argues that he was not read

his rights prior to questioning. This argument is baseless. The video demonstrates that Agent Rehg

informed Wysinger at the beginning of the interrogation that he was under arrest, that Wysinger had

the right to remain silent, that anything Wysinger said could be used against him, that Wysinger had

the right to consult an attorney before questioning, that Wysinger had the right to have an attorney

present during questioning and that an attorney would be provided if Wysinger could not afford

one. That was everything that *Miranda v. Arizona* requires. *See* 384 U.S. 436, 478–79 (1966) ("[W]hen

an individual is taken into custody or otherwise deprived of his freedom by the authorities in any

significant way and is subjected to questioning, the privilege against self-incrimination is

jeopardized. . . . He must be warned prior to any questioning that he has the right to remain silent,

that anything he says can be used against him in a court of law, that he has the right to the presence

of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any

questioning if he so desires.").

Wysinger's second *Miranda*-based argument is that he did not waive his right to remain silent

or his right to counsel. Although there is no evidence of an explicit waiver here, an accused

individual can implicitly waive *Miranda* rights. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261 (2010)

(citing *North Carolina v. Butler*, 441 U.S. 369, 376 (1979)). To establish implicit waiver, the prosecution

must demonstrate not only that a *Miranda* warning was given and the accused offered an uncoerced

statement, but also that the accused understood the *Miranda* rights. *Id.* All three elements are present

here: Wysinger was read his rights, he stated that he understood those rights and he made uncoerced

statements. He waived his *Miranda* rights.

Wysinger's third and final *Miranda*-based argument is that he invoked his right to an attorney

before the agents read Wysinger his *Miranda* rights and at several times during the interrogation. If a

defendant indicates "in any manner and at any stage" of the interrogation process "that he wishes to

consult with an attorney before speaking there can be no questioning" by law enforcement. *Miranda*,

384 U.S. at 444–45. However, the accused must clearly and unambiguously invoke the right to

counsel, and whether the accused has invoked the right clearly and unambiguously is an objective inquiry:

> If the suspect makes a reference to an attorney that is ambiguous "in that a reasonable officer in light of the circumstances would have understood that the suspect might be invoking the right to counsel," it is not necessary for the authorities to cut off questioning. Law enforcement officials are not under any obligation to clarify ambiguous statements made by an accused. The burden is instead on the suspect to make a "clear and unambiguous assertion of his right to counsel to stop questioning."

*United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009) (citations omitted) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994); *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005)) (citing *United States v. Muhammad*, 120 F.3d 688, 698 (7th Cir. 1997)).

The necessity for clarity and unambiguity in *Miranda* invocations has been reiterated in a recent decision of the Supreme Court. *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010). Writing for the Court, Justice Kennedy said that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*[ *v. United States*]." *Id.* at 2260 (citing *Solem v. Stumes*, 465 U.S. 638, 648 (1984)). Based on this principle, the Court held that a defendant who was silent for two hours and forty-five minutes did not assert his right to remain silent without making "simple, unambiguous statements" that he wanted to remain silent or not talk to the police. *Id.* By so holding, the Court extended the clarity requirement in *Davis* to apply not only to invoking the right to counsel during interrogation but also to the right to remain silent.

Wysinger's pre-warning statements concerning counsel were neither clear nor unambiguous. The only pre-warning statement of Wysinger's that could possibly qualify as an assertion of the right to counsel would be, "Do I need a lawyer before we start talking?" Much like the statement "am I going to be able to get an attorney?" this statement is ambiguous. *See Shabaz*, 579 F.3d at 819 ("The words 'am I going to be able to get an attorney?' did not unambiguously indicate to Agent Watson

that Shabaz was right then asking for an attorney."); *see also id.* (noting that phrases like "I can't afford a lawyer but is there anyway [sic] I can get one?" "I don't know if I need an attorney," or "maybe I should talk with an attorney" do not invoke the right to counsel). While a reasonable officer in light of the circumstances may have understood that Wysinger was invoking his right to counsel, the same officer could have understood Wysinger to be asking the officers what his rights were in that circumstance. The agents had no obligation to break off questioning at that point as Wysinger did not clearly and unambiguously assert his right to counsel.

Wysinger's post-warning statements concerning counsel were not clear and unambiguous either. There were three post-warning statements that discuss a lawyer: "I mean, you think I should have a lawyer?"; "Okay, but can I call one now?"; and "I just don't want to cross no lines and—you know what I'm saying?—regret shit. I mean, 'cuz I wanna work with you, you know what I'm saying?" Neither of the statements, however, clearly and unequivocally invoked the right to counsel. The first statement, "I mean, you think I should have a lawyer?" is the same in content as "Do I need a lawyer before we start talking?" The Court held that the agents had no obligation to break off questioning when Wysinger uttered the latter statement, so they had no obligation to break off questioning when presented with the former statement. The second and third statements, given the context of the situation in which Wysinger was making it, are also not clear and unambiguous. All throughout the interview Wysinger and the agents discussed the possible benefits and obligations that could result from cooperation. Given that context, the "can I call one now" statement could have been the assertion of the right but it could also equally have been Wysinger's attempt to get assurance from the agents that he would still be considered cooperating if he consulted an attorney, and thus keep him and his brother eligible for the recommendation to the prosecutor for leniency. The third statement is even more equivocal: it merely demonstrates Wysinger's thought process in

considering consulting an attorney, which is very different from clearly and unambiguously asserting a right to an attorney.

None of Wysinger's statements asserted his right to counsel clearly and unambiguously. He was properly warned of his rights and was properly interrogated. His statements made during that interrogation, and the accompanying video, cannot be suppressed.

### Conclusion

Because the motions are without merit, the Court **DENIES** all of Wysinger's pretrial motions (Docs. 101–108).

**IT IS SO ORDERED.**

**DATED July 14, 2010.**

s/ Michael J. Reagan
**MICHAEL J. REAGAN**
**United States District Judge**